96 P.3d 590

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Glenn Kealoha KUHIA, Defendant–Appellant.**

**No. 24440.**

Intermediate Court of Appeals of Hawai'i.

July 29, 2004.

As Amended Aug. 2 and Aug. 13, 2004.

State of Hawai'i. He was sentenced on each count to concurrent terms of five years probation.

Kuhia appeals from the July 16, 2001 Judgment entered by the Circuit Court of the First Circuit. On appeal, Kuhia argues that the trial court should have *sua sponte* instructed the jury on the definition of "public servant" found in HRS § 710–1000(15) (1993).[2] Kuhia interprets this definition as limiting the application of HRS § 707–716(1)(c) to terroristic threats made against a public servant who, *at the time the threat was made*, was actively performing a governmental function and acting within the scope of his or her employment. He challenges the constitutionality of HRS § 707–716(1)(c) on vagueness grounds if his restrictive definition of "public servant" is not adopted. In addition, Kuhia argues that the trial court erred in failing to instruct the jury that a "true threat" was required. We reject Kuhia's arguments and affirm the circuit court's Judgment.

## I. BACKGROUND AND PROCEDURAL HISTORY

Kuhia began actively pursuing his Hawaiian genealogy after he learned about a quiet title action permitting the heirs of Mahu to claim an interest in land on Maui. In order to prove his right to intervene in that action, Kuhia embarked on a diligent search to document and prove his Hawaiian roots. Based on his research, Kuhia believed that he was not only an heir of Mahu, but also an heir of Queen Lili'uokalani. For reasons that are not clear, Kuhia's search for his genealogy also led him to believe that his father, whose death in 1960 had been classified as a suicide, had in fact been murdered.

Kuhia's efforts to prove his Hawaiian genealogy and to assert his rights as a Native Hawaiian brought him into contact with State agencies established to assist Native Hawaiians, including the Office of Hawaiian Affairs

Mangmang Qiu Brown, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellee.

Pamela E. Tamashiro, Esq., Honolulu, for defendant-appellant.

BURNS, C.J., FOLEY and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Glenn Kealoha Kuhia (Kuhia) was convicted by jury of two counts of making a terroristic threat against a public servant, in violation of Hawaii Revised Statutes (HRS) § 707–716(1)(c) (1993).[1] Kuhia's convictions were based on separate incidents in which he threatened to kill individuals employed or hired on a contract basis by the

---

1. The Honorable Virginia Lea Crandall presided.

2. The term "public servant" is not defined in the terroristic threatening statutes, Hawaii Revised Statutes (HRS) §§ 707–715 to 707–717 (1993), nor in HRS Chapter 707, Offenses Against The Person. Kuhia seeks to incorporate the definition of "public servant" applicable to HRS Chapter 710, Offenses Against Public Administration.

(OHA) and the Hawaiian Homes Commission (HHC). It was Kuhia's confrontations with persons employed by or working under contract for these agencies that led to the charges in this case.

## A. Threats Against Colin Kippen, Jr.

In 1999, Colin Kippen, Jr. (Kippen) was OHA's Deputy Administrator. His responsibilities included administering the office and implementing the policies of the board of trustees. Kippen began working for OHA in late 1997.

OHA funds the Native Hawaiian Legal Corporation (NHLC) to provide legal services to qualifying Native Hawaiians. In 1997, Kuhia asked the NHLC to represent him in a quiet title action involving land on Maui so that he could assert a claim as an heir of Mahu. In support of his request for representation, Kuhia produced records he believed showed that he was an heir of Mahu. The NHLC, however, denied Kuhia's request for representation because its research indicated that Kuhia was descended from a family named Lee, and that he was not an heir of Mahu. After the denial of representation by the NHLC, Kuhia immersed himself in research to prove his Hawaiian genealogy and to show that records relied upon by the NHLC were incorrect.

Kuhia later turned to OHA. Kuhia wanted Kippen, on behalf of OHA, to direct the NHLC to represent Kuhia in the quiet title action. Kippen contacted the NHLC and received back a letter explaining that the NHLC could not accept Kuhia as a client or file a claim on his behalf because it did not have a good faith belief that he was an heir of Mahu. On February 1, 1999, Kippen prepared a letter advising Kuhia that OHA could not force the NHLC to take Kuhia as a client in breach of NHLC's ethical duties.

On February 2, 1999, Kuhia went to OHA's offices. Kuhia became very angry after reading Kippen's letter and threw the letter back at Kippen. Kuhia demanded that Kippen return original genealogical documents that Kuhia claimed to have given to OHA

staff on previous occasions. Kippen knew it was OHA's policy to make a copy of any original document submitted and to return the original. He also checked with OHA staff members, who all stated that any original documents submitted by Kuhia had been copied and returned to him.

Kuhia was "very upset" and "very angry" when Kippen did not satisfy Kuhia's demand for the original documents. Kuhia yelled, swore, and directed racial epithets at an OHA staff member. Kippen walked away because he could not satisfy Kuhia's demand, and Kuhia called the police. The officers arrived and tried to convince Kuhia that the dispute over the records was a civil matter. However, when Kuhia refused to leave without the records, the police arrested Kuhia for trespassing. After the February 2, 1999 incident, OHA obtained a restraining order against Kuhia.[3]

Kuhia's ongoing quarrel with Kippen, OHA, and the NHLC provided the backdrop for the terroristic threats Kuhia was charged with making against Kippen. At trial, Kippen testified that on March 17, 1999, he was on his way to testify before the Legislature in his capacity as the Deputy Administrator for OHA. Kippen was walking through the 'Iolani Palace grounds and had just passed the Archives Building when he saw Kuhia about 20 yards away.

As soon as Kippen made eye contact, Kuhia quickened his pace. When Kuhia got within five yards of Kippen, Kuhia took off his shirt. Kuhia inflated his chest, clenched his fists, held them up, and came at Kippen. Kuhia told Kippen that he was going to kill Kippen and the Governor because they killed his father.

In response, Kippen backed away. He told Kuhia, "[Y]ou can't talk to me. You cannot be doing this." Kippen attempted to deter Kuhia by referring to Kuhia's arrest at OHA's offices a month earlier. Kuhia, however, would not stop. Kippen testified:

> He [Kuhia] kept coming at me. He kept threatening me. He called me a fucking

---

**3.** Kippen testified that prior to February 2, 1999, Kuhia had also come to the offices of the Office

of Hawaiian Affairs (OHA) and yelled and swore at receptionists, staff, and an attorney.

haole[4] at that point. He continued to threaten me. He threatened my family that he was going to kill them, and he just kept coming, so I retreated.

Kippen turned around and sought sanctuary inside the Archives Building. He asked a member of the Archives staff to call "911" because "[s]omebody just threatened my life."

Kuhia pursued Kippen but stopped at the glass doors to the Archives Building. He maintained eye contact with Kippen and eventually sat on a wall about 40 yards away. Kuhia remained there, glaring at Kippen, until the police arrived. Kippen pointed out Kuhia to the police, and Kuhia was arrested.

## B. Threats Against Allen Hoe

In October of 1998, Allen Hoe (Hoe), an attorney in private practice, was working on a contract basis as a contested hearings officer for the HHC. Hoe was hired to conduct hearings in disputes between the Department of Hawaiian Home Lands (DHHL) and its Native Hawaiian beneficiaries, and to assist in resolving those disputes.

Hoe testified at trial that on the morning of October 14, 1998, he was crossing Punchbowl Street after representing a private client at a labor hearing. He noticed Kuhia on the other side of the street. Kuhia caught Hoe's attention because Kuhia was wearing a pith helmet and a trench coat. Kuhia pointed at Hoe and screamed, "You Allen Hoe, aren't you?" Hoe did not recognize Kuhia and responded, "Yeah, do I know you?" Kuhia told Hoe, "I'm going to kill you, you fuckah." Hoe replied that he did not know Kuhia and questioned why Kuhia was going to kill him. Kuhia repeated, "I'm going to kill you, you fuckah."

While threatening to kill Hoe, Kuhia was screaming at the top of his voice, exhibited early signs of rage, and was very animated. During their encounter, which lasted three to five minutes, Kuhia repeated his threats to kill Hoe several times. Kuhia also accused Hoe of murdering Kuhia's father and threat-

ened to kill Hoe's family. Kuhia told Hoe, "[J]ust because you used to be one District Court Judge not going to save you, and you can call the cops, I'm going to kill them too after I take care of your family." Hoe testified that Kuhia's threats made him very apprehensive and "kind of rocked me back." Kuhia told Hoe to talk to John Hirota, an employee of the DHHL, if Hoe had any questions about who "Kealoha Kuhia" was.

While threatening Hoe, Kuhia got to within inches of Hoe's face, but did not strike Hoe. Hoe tried on several occasions to walk around Kuhia and leave, but Kuhia kept positioning himself to block Hoe's path. Finally, Hoe told Kuhia that he was leaving, and said, "[Y]ou know what, Bruddah, you do what you got to do." As Hoe walked away from Kuhia, Hoe "clearly expected" to be hit from behind by Kuhia.

Later that day, Hoe talked to John Hirota, the DHHL's Homestead District Operations Manager. Hirota helped coordinate the contested case hearings for the DHHL over which Hoe presided. Hoe asked Hirota if he knew a person named Kealoha Kuhia. Hirota said that he knew a person named Glenn Kuhia and provided a description which matched the man who had threatened Hoe. Hoe asked Hirota if he had any idea why Kuhia would accost Hoe in the street. Hirota reminded Hoe of an incident earlier that year in which Hoe had excluded a group of people that included Kuhia from sitting in on an HHC contested case proceeding.

Hoe then recalled asking a group of people to leave an HHC contested case hearing because the parties objected to the group's presence. A member of the group protested that the group had a right to be present because it was a public hearing. Hoe advised the group that it was not a public hearing, and that the hearing would not go forward until the group left. Hoe recalled asking Hirota to explain the requirements to the group and that the group departed without incident.

The day after being threatened by Kuhia, Hoe filed a complaint against Kuhia with the

4. "Haole" is a Hawaiian word for "Caucasian." Mary K. Pukui and Samuel H. Elbert, *Hawaiian Dictionary* 58 (1986).

police. Hoe testified that Kuhia's threats had "rattled my cage," and that Hoe believed they were "too serious" for him not to file the complaint.

## C. Kuhia's Defense

Kuhia provided a completely different version at trial of the charged incidents involving Kippen and Hoe. Kuhia testified that he never even spoke to Kippen on March 17, 1999. Kuhia also denied making any threatening remarks to Hoe on October 14, 1998.

Kuhia acknowledged that when he encountered Kippen on March 17, 1999, he knew that Kippen was an OHA official. Kuhia admitted his prior dispute with Kippen related to OHA's refusal to assist him in the Maui quiet title action and confirmed his trespassing arrest at the OHA offices in February of 1999. Kuhia further stated that he knew Kippen was the OHA official who had placed the restraining order on him.

Kuhia testified that on March 17, 1999, he saw Kippen walking on the 'Iolani Palace grounds near the Archives Building. According to Kuhia, Kippen was about 10 feet in front of him when he first saw Kippen. Kuhia testified that Kippen turned to look at him, then walked into the Archives Building, without any words being exchanged. Kuhia testified as follows:

Q. And then what did [Kippen] do?

A. Then [Kippen] turn around, he looked at me and he walked into the archives. And the next thing I knew, the police was coming.

Q. And so no words were exchanged?

A. No, because I had the restraining order. If I talk to Mr. Kippen, then I would be placed under arrest and go to jail for a year so, therefore, *I did not talk to Mr. Kippen.*

(Emphasis added.)[5]

As to the Hoe incident, Kuhia admitted that when he encountered Hoe on October 14, 1998, he recognized Hoe as the person who had previously kicked him out of an HHC contested hearing. Kuhia's only prior contact with Hoe had been at that hearing. Kuhia testified that during their encounter on October 14, 1998, he told Hoe to see John Hirota when Hoe said he did not remember Kuhia. According to Kuhia, he told Hoe that if his genealogy research was correct, then Kuhia was an heir of Queen Lili'uokalani and the 200,000 acres that Hoe was commissioner over had to be returned to Kuhia and his family. Kuhia also told Hoe that if Kuhia found out that Hoe had something to do with his father's murder, that Kuhia would "pursue legal action in a court of law to have [Hoe] prosecuted." Kuhia testified that he never at any time threatened Hoe. Kuhia explained that the proof of his genealogy was so strong, there was no need to threaten anyone, and that he was trying to prove his entitlement to land as the heir of Queen Lili'uokalani in a "peaceful ... orderly ... [and] nonviolent" way.[6]

## D. The Jury Instructions

Except for the date of the offense and the name of the alleged victim, the trial court gave the same instruction for the offense of Terroristic Threatening in the First Degree charged in Counts 1 and 2. The court instructed the jury that:

A person commits the offense of Terroristic Threatening in the First Degree, if, in reckless disregard of the risk of terrorizing a public servant, he threatens, by word or conduct, to cause bodily injury to the pub-

---

**5.** Kuhia also testified that sometime after his arrest at OHA's offices on February 2, 1999, but before his encounter with Kippen on March 17, 1999, Kippen almost ran Kuhia over while Kuhia was crossing the street. Kuhia testified that Kippen was driving a black BMW. Kippen denied the BMW incident and further testified that he had never ridden in a black BMW, that no one in his family owned a black BMW, and that the car he was driving in 1999 was a 1972 Volkswagen bug.

**6.** The prosecution also introduced, without objection, a transcript of a recorded statement Kuhia made to the police on November 2, 1998. In his statement, Kuhia claimed that Hoe had thrown him out of a Department of Hawaiian Home Land (DHHL) hearing, and that Hoe was prejudiced against him as a Hawaiian. Kuhia, however, specifically denied making any threats against Hoe during their encounter on October 14, 1998, and instead referred to having a "casual conversation" with Hoe.

lic servant who was, at that time, in the performance of official duties.

There are four material elements of the offense of Terroristic Threatening in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

These four elements are:

1. That, on or about [alleged date of the offense], in the City and County of Honolulu, the defendant threatened, by word or conduct, to cause bodily injury to [the alleged victim]; and

2. That the defendant did so in reckless disregard of risk of terrorizing that person; and

3. That the person threatened was, at that time, a public servant; and

4. That, at that time, the defendant knew or recklessly disregarded a substantial and unjustifiable risk, that the person was a public servant.

Kuhia did not object to the instruction given by the court. He did, however, propose an additional instruction on the threat requirement, as follows:

> Threats punishable consistently with the First Amendment are only those which according to their language and context convey a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected speech.

Kuhia argued that his proposed instruction was a proper statement of the law and would help the jury focus on the difference between protected and unprotected speech under the First Amendment. The trial court, over Kuhia's objection, refused to give this instruction. Kuhia did not offer any additional instruction on the meaning of "public servant." [7]

### E. Closing Argument

In closing argument, Kuhia's counsel specifically acknowledged that both Hoe and Kippen were public servants, but urged the jury to reject their testimony.

> Now, Mr. Allen Hoe and Mr. Colin Kippen, Jr. *are both public servants;* and I would suggest to you that when you look at their testimony, which reflects on their credibility, their demeanor on the stand, the way they testified, I believe casts a light that suggest that they may have been less than truthful in telling you what happened.

(Emphasis added.)

Kuhia's counsel argued that the last several years of Kuhia's life had been focused exclusively on proving his genealogy through legal channels. Kuhia had gone through too much effort to throw it away by threatening Hoe and Kippen. Kuhia's defense, as articulated by his counsel, was that Kippen and Hoe were lying because Kuhia had not made any threats against them:

> My point being here is that Mr. Kuhia has spent exclusively the past two or three years of his life going through documents, going through the Court, going through administrative hearings, going through legal means in which to accomplish his purpose. And he's not going to throw it away by some chance encounter by threatening these two guys when he knows that the way to accomplish what he wants is through the court and through the burial council.

The closing argument of Kuhia's counsel focused on the irreconcilable conflict between Kuhia's version and the alleged victim's version of each encounter. Kuhia's counsel urged the jury to believe Kuhia's version—that Kuhia never uttered any threats against Hoe or Kippen—and to reject the contrary testimony of Kippen and Hoe as not credible.

### F. Jury Deliberations and Post–Trial Motions

The trial court finished instructing the jury in the afternoon on May 8, 2001. The jurors

---

7. In his brief, Kuhia states that at a post-trial hearing, both the prosecutor and trial court recalled that the HRS § 710–1000(15) (1993) definition of "public servant" had been discussed and rejected by the trial court. However, Kuhia's appellate counsel, who was also trial counsel, admits that she had no recollection of such discussion, nor could she find any record of such discussion. Because the record on appeal does not show any objection by Kuhia to the trial court's instruction on the term "public servant," nor any request for additional instruction on that term, we assume that no objection was made.

were told that after they selected a foreperson, they would be excused for the day and could commence their deliberations the following day.

During its deliberations on May 9, 2001, the jury submitted the following question:

IS A PERSON CONSIDERED A PUBLIC SERVANT ONLY WHEN THEY ARE PERFORMING OFFICIAL DUTIES? PAGE 19 LAST LINE OF PARAGRAPH 2 V. ELEMENT # 3.[8]

The State asked the court to respond by stating that "a public servant does not need to be performing official duties at the time of the threat, just that he is a public servant at that time." The court, over the State's objection, responded by advising the jury, "Please review the instructions and follow them as written." Kuhia did not object to the court's response. In the early afternoon on May 9, 2001, the jury returned verdicts of guilty against Kuhia on both counts.

On May 23, 2001, Kuhia filed a Motion for Judgment of Acquittal After Discharge of Jury. In his written motion, Kuhia claimed that HRS § 707–716(1)(c) was facially unconstitutional because the statute was overbroad as it applied to a "public servant." Kuhia had raised a similar claim in an oral motion to dismiss the indictment at the close of the State's case-in-chief at trial. At the June 21, 2001 hearing on the motion, Kuhia also argued, for the first time, that the trial court erred in failing to instruct the jury on the definition of "public servant" set forth in HRS § 710–1000(15).

On June 26, 2001, the trial court filed its Findings of Fact, Conclusions of Law and Order Denying Defendant's Motion for Judgment of Acquittal After Discharge of Jury. The court ruled that HRS § 707–716(1)(c) was not unconstitutional on its face or as applied to Kuhia's conduct, and that the failure to instruct on the HRS § 710–1000(15) definition of "public servant" did not affect the validity of Kuhia's convictions.

■ Kuhia was sentenced on July 16, 2001, and the circuit court filed its Judgment on the same day. On July 26, 2001, Kuhia timely filed a notice of appeal of the Judgment.[9]

## II. STANDARDS OF REVIEW

### A. Jury Instructions

■ When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading, . . . .

[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility

---

**8.** The jury's question was apparently prompted by the difference between the court's general description of the charged offense as involving a threat to cause bodily injury to a "public servant who was, at that time, in the performance of official duties," and the essential elements instruction which only required as the third element "[t]hat the person threatened was, at that time, a public servant."

**9.** On August 22, 2001, Kuhia filed an amended notice of appeal, which identified both the July 16, 2001 Judgment and the June 26, 2001 order denying his motion for judgment of acquittal as matters being appealed. The amended notice of appeal was not necessary since Kuhia's initial appeal of the July 16, 2001 Judgment already preserved any right he had to contest the order denying his motion for judgment of acquittal.

We note, however, that the record shows that Kuhia's motion for judgment of acquittal was filed more than ten days after the jury was discharged after its guilty verdicts. The trial court therefore lacked jurisdiction to entertain the motion, and we cannot review the court's order denying it. *State v. Reed,* 77 Hawai'i 72, 82–83, 881 P.2d 1218, 1228–29 (1994), *overruled on other grounds by State v. Balanza,* 93 Hawai'i 279, 288, 1 P.3d 281, 290 (2000). In any event, the same arguments Kuhia uses on appeal to challenge the order denying his motion for judgment of acquittal are also asserted as the basis for vacating the Judgment. We therefore consider the merits of Kuhia's arguments despite his inability to challenge separately the denial of his motion for judgment of acquittal.

that error may have contributed to conviction.... If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Valentine*, 93 Hawai'i 199, 204, 998 P.2d 479, 484 (2000) (citations and internal quotation signals omitted; brackets in original).

As a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error.... [T]his Court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights.

*State v. Sawyer*, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (citations omitted).

## B. Constitutionality of Statute

█ The constitutionality of a statute is a question of law that we review under the right/wrong standard. *State v. Lee*, 75 Haw. 80, 90, 856 P.2d 1246, 1253 (1993). The Hawai'i Supreme Court has held that "(1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." *Convention Ctr. Auth. v. Anzai*, 78 Hawai'i 157, 162, 890 P.2d 1197, 1202 (1995) (internal quotation marks and brackets omitted).

## C. Statutory Interpretation

█ The interpretation of a statute is a question of law that we review *de novo*. *State v. Kelekolio*, 94 Hawai'i 354, 357, 14 P.3d 364, 367 (App.2000). When interpreting a statute,

our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, [a court's] only duty is to give effect to [the statute's] plain and obvious meaning.

*State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) (internal quotation marks, citations, and brackets in original omitted).

## III. DISCUSSION

### A. The Trial Court Did Not Commit Plain Error in Failing to Further Instruct on the Term "Public Servant."

A terroristic threat made against any person is a crime subject at least to punishment as a misdemeanor. HRS §§ 707–715, 707–717 (1993). Certain types of terroristic threats, including those made against a public servant, are punishable as a class C felony. HRS § 707–716. HRS § 707–716(1)(c) provides in relevant part:

(1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

. . . .

(c) Against a public servant.... [10]

█ We agree with Kuhia that the legislative history of HRS § 707–716(1)(c) indicates that the Legislature intended the term "public servant" found in that statute to be construed consistently with the definition in HRS § 710–1000(15).[11] We disagree, however, with Kuhia's interpretation of HRS § 710–1000(15) as meaning that a person qualifies as a public servant only during the times he or she is actively performing a

---

10. HRS § 707–715 in turn defines "terroristic threatening" in relevant part as follows: "A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person ... [w]ith the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]"

11. The bill that eventually became HRS § 707–716(1)(c) originally used the term "public offi-

cial." The bill was amended to replace "public official" with the term "public servant." In explaining this change, the committee report noted that "public servant" was the term used and defined in HRS § 710–1000(15), and that use of the term "public official" would confuse the scheme established in the Penal Code to deal with the use of threats. Sen. Stand. Comm. Rep. No. 902, in 1979 Senate Journal, at 1410.

governmental function and acting within the scope of his or her employment.

The definition of "public servant" in HRS § 710–1000(15) contains three clauses, as diagrammed below:

"Public servant" means [1] any officer or employee of any branch of government, whether elected, appointed, or otherwise employed, **and** [2] any person participating as advisor, consultant, or otherwise, **in performing a governmental function,** but [3] the term does not include jurors or witnesses[.]

(Emphasis and bracketed numbers added.) The term "governmental function" is further defined in HRS § 710–1000(6) (1993) as including "any activity which a public servant is legally authorized to undertake on behalf of the government."

Kuhia apparently reads the phrase "in performing a government function" as modifying both clause [1] and clause [2]. We believe a far more natural reading of the statute is that this phrase only modifies clause [2]. Accordingly, we conclude that under HRS § 710–1000(15) any "officer or employee of any branch of government" qualifies as a public servant.

We also reject Kuhia's interpretation of the phrase "in performing a governmental function" as meaning that a person qualifies as a public servant under clause [2] only at the precise time he or she is performing government-related activities. Instead, we interpret that phrase as qualifying a person as a public servant based on the type of work he or she performs, and not based on when that work is being performed. Under our reading of clause [2], a person whose activities include performing a governmental function in the capacity of an advisor or consultant qualifies as a public servant. Contrary to Kuhia's claim, State employees and those hired on a contract basis to perform governmental functions do not lose their status as public servants the moment they engage in non-governmental activities.

Kuhia's interpretation of HRS § 710–1000(15) must further be rejected because it would lead to absurd results. *Gray v. Admin. Dir. of the Court,* 84 Hawai'i 138, 148,

931 P.2d 580, 590 (1997) (ruling that legislation will be construed to avoid an absurd result). The HRS § 710–1000(15) definition of "public servant" applies to all HRS Chapter 710 offenses, including bribery under HRS § 710–1040 (1993). That section provides in relevant part:

§ 710–1040 **Bribery.** (1) A person commits the offense of bribery if:

. . . .

(b) While a public servant, the person solicits, accepts, or agrees to accept, directly or indirectly, any pecuniary benefit with the intent that the person's vote, opinion, judgment, exercise of discretion, or other action as a public servant will be thereby influenced.

Under Kuhia's interpretation of "public servant," a corrupt State employee or person hired on a contract basis to perform governmental functions who simply waited until after work to solicit and accept bribes could not be prosecuted under HRS § 710–1040(1)(b). The Legislature could not have intended such an absurd result.

Our interpretation of HRS § 710–1000(15) is reinforced by the Model Penal Code (MPC) and its comments. MPC and Commentaries (Official Draft and Revised Comments (1980)). The MPC was used by the Judicial Council of Hawai'i as the guide for the Hawai'i Penal Code (HPC). *In re Doe, Born on January 5, 1976,* 76 Hawai'i 85, 94–95, 869 P.2d 1304, 1313–14 (1994). The Hawai'i Supreme Court has used the MPC and its comments to inform the court's efforts to glean the scope of parallel statutes in the HPC. *State v. Gaylord,* 78 Hawai'i 127, 140 n. 22, 890 P.2d 1167, 1180 n. 22 (1995). MPC § 240.0(7) contains a definition of "public servant" which was the precursor of HRS § 710–1000(15). MPC § 240.0(7) defines that term as follows:

"public servant" means any officer or employee of government, including legislators and judges, and any person participating as a juror, advisor, consultant or otherwise, in performing a governmental function; but the term does not include witnesses[.]

MPC and Commentaries § 240.0(7) at 4. The comment to MPC § 240.1, which discusses

this definition of "public servant," states that the term covers "any government employee, however lowly." *Id.* at 29. The comment specifically discusses the clause "any person participating as a juror, advisor, consultant or otherwise, in performing a governmental function," which closely mirrors the language of HRS § 710–1000(15). The comment states that the purpose of this clause was to "include persons who are temporarily in the government service as well as those who hold a more permanent status." *Id.* Nothing in the comment supports Kuhia's contention that a person's status as a public servant should fluctuate throughout the day based on whether the person happened to be performing government-related activities.

We conclude that the trial court did not err in failing to instruct the jury in accordance with Kuhia's erroneous interpretation of the term "public servant." [12] Nor did the court commit plain error in failing *sua sponte* to instruct on the definition of "public servant" set forth in HRS § 710–1000(15). In closing argument, Kuhia's counsel acknowledged both Kippen and Hoe were public servants. Moreover, the commonly understood meaning of that term, consistent with the HRS § 710–1000(15) definition, is broad enough to encompass individuals such as Kippen and Hoe who were employed full-time by a state agency or hired on a contract basis to perform government-related services. Kuhia does not dispute that Kippen and Hoe were employed by the State or under contract with the State to perform government-related ser-

vices at the time of the charged offenses. Under these circumstances, Kuhia is not entitled to relief under the plain error standard of review.[13]

### B. HRS Section 707–716(1)(c) Is Constitutional As Applied to Kuhia's Conduct.

Kuhia describes a hypothetical situation in which a motorist who, as the result of a traffic accident, threatens to cause bodily injury to another motorist who happens to be a public servant. Kuhia argues that HRS § 707–716(1)(c) is unconstitutionally vague because it can be construed as applying to this hypothetical situation in which there is no nexus between the threat and the public servant's official duties.[14]

The Hawai'i Supreme Court has held that in order to challenge the constitutionality of a statute on vagueness grounds, a defendant must show that the statute as applied to him or her is invalid. *State v. Marley*, 54 Haw. 450, 457, 509 P.2d 1095, 1101 (1973). Constitutional rights may not be asserted vicariously. *Id.* A defendant has no standing to challenge the vagueness of a statute based on its hypothetical application in other situations. *Marley*, 54 Haw. at 457–58, 509 P.2d at 1101–02.[15]

We therefore need not address whether HRS § 707–716(1)(c) could constitutionally be applied to Kuhia's hypothetical of a terroristic threat against a public servant that

---

**12.** Our rejection of Kuhia's interpretation of the term "public servant" also renders inconsequential any discrepancy in the court's jury instructions between the general description of the offense as involving a threat to a "public servant who was, at the time, in the performance of official duties," and the elements of proof which required that "the person threatened was, at that time, a public servant." To the extent that the general description of the offense included a more restrictive definition of "public servant" than necessary, that redounded to Kuhia's benefit and does not entitle him to any relief.

**13.** We do not decide whether additional instructions defining the term "public servant" may be required in circumstances different from this case.

**14.** For the hypothetical to be complete, the threatening motorist would also have to know or recklessly disregard a substantial and unjustifia-

ble risk that his victim was a public servant. The jury was so instructed in Kuhia's prosecution.

**15.** The United States Supreme Court has similarly held that where a vagueness challenge to a statute does not implicate First Amendment freedoms, the statute must be evaluated as applied to the facts of the case. *Chapman v. United States*, 500 U.S. 453, 467, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991); *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975). Terroristic threats, including those made against public servants, are not protected by the First Amendment. *State v. Chung*, 75 Haw. 398, 415–17, 862 P.2d 1063, 1072–73 (1993). Accordingly, Kuhia's vagueness challenge to HRS § 707–716(1)(c) does not implicate the First Amendment.

was unrelated to his or her official duties. Instead, we must evaluate Kuhia's vagueness claim in terms of the statute's application to his own conduct. When examined in this light, Kuhia's claim has no merit since the overwhelming evidence established that Kuhia's threats against Kippen and Hoe were related to their performance of official duties.

Prior to threatening Hoe, Kuhia's only contact with Hoe had come when Hoe asked Kuhia to leave an HHC contested case hearing over which Hoe was presiding. When he threatened Hoe, Kuhia recognized Hoe as the official who had kicked him out of the hearing, an action Kuhia believed showed Hoe's prejudice against him. Kuhia's threats against Kippen came six weeks after Kippen, as OHA's Deputy Administrator, rejected a request by Kuhia for OHA's help in pursuing the Maui quiet title action. The rejection, which Kuhia interpreted as a repudiation of his genealogical research, upset and angered Kuhia. It started a chain of events that resulted in Kuhia's arrest for trespassing and OHA obtaining a restraining order against him. During the encounter in which Kuhia threatened Kippen, Kuhia knew that Kippen was the OHA official who had refused his request for assistance and had obtained the restraining order against him.

We conclude that HRS § 707–716(1)(c) is not unconstitutionally vague when applied to Kuhia's conduct of threatening to kill Kippen and Hoe because of their performance of official duties. The statute gave Kuhia fair notice that his conduct was prohibited and afforded him the opportunity to choose between lawful and unlawful conduct. *State v. Lee*, 75 Haw. at 92, 856 P.2d at 1254.

### C. Any Error in the Trial Court's Failure to Give an Additional "True Threat" Instruction Was Harmless.

After Kuhia's trial was completed, the Hawai'i Supreme Court decided *State v. Valdivia*, 95 Hawai'i 465, 24 P.3d 661 (2001). Relying on *Valdivia*, Kuhia claims that the trial court committed reversible error in failing to give the jury a "true threat" instruction, which would require it to find that the alleged threat was made with gravity of purpose and with imminent prospect of execution.

In *Valdivia*, the defendant attempted to flee from the police and resisted arrest. *Id.* at 470, 24 P.3d at 666. Once apprehended, the defendant was handcuffed and taken to the hospital. *Id.* Two officers escorted the defendant into the hospital and stood on either side of him while he awaited treatment. *Id.* at 471, 24 P.3d at 667. The defendant, while still handcuffed with his hands behind his back, turned to one officer and said, "I'm gonna kill you and your police uniform." *Id.* Based on this statement, the defendant was charged with Terroristic Threatening in the First Degree for making a threat against a public servant.

The trial court, over the defendant's objection, gave a "true threat" instruction that did not require the jury to find that the threat was made with "an imminent prospect of execution." *Id.* at 478, 24 P.3d at 674. On appeal, the defendant claimed that the "true threat" instruction was prejudicially insufficient. *Id.*

The Hawai'i Supreme Court found that in a terroristic threatening prosecution, the government must prove beyond a reasonable doubt that a "remark threatening bodily conduct is a 'true threat,' such that it conveyed to the person to whom it was directed a gravity of purpose and imminent prospect of execution." *Id.* at 476, 24 P.3d at 672. Stated another way, the prosecution must prove that the "alleged threat was objectively capable of inducing a reasonable fear of bodily injury in the person at whom the threat was directed and who was familiar with the circumstances under which the remarks were uttered." *Id.* The court stated that one way to meet the "imminency" requirement was to show that the defendant possessed "'the apparent ability to carry out the threat,' such that 'the threat ... would reasonably tend to induce fear [of bodily injury] in the victim.'" *Id.* at 477, 24 P.3d at 673 (quoting *In re M.S.*, 10 Cal.4th 698, 42 Cal.Rptr.2d 355, 896 P.2d 1365, 1372–74 (1995)).

The court found that the trial court's omission of the "imminency" requirement from the "true threat" instruction rendered the instruction erroneous and presumptively

harmful. *Valdivia*, 95 Hawai'i at 478, 24 P.3d at 674. The court concluded that the record as a whole did not rebut this presumption, and therefore vacated the defendant's conviction for first degree terroristic threatening. *Id.*

The State argues that Kuhia's reliance on *Valdivia* is misplaced. It contends that *Valdivia* does not mandate that a "true threat" instruction be given in every case, but only where there is evidence to support it. It further contends that the evidence adduced at trial did not warrant a "true threat" instruction. Kuhia acknowledges that a "true threat" instruction may not be required in every case, but maintains that it was required here.

■ We need not decide whether the trial court erred in failing to give a "true threat" instruction. This is because we conclude that based on the entire record in this case, any such error was harmless beyond a reasonable doubt.

The alleged victims and Kuhia presented irreconcilable versions of what had happened regarding the charged threats. Both Kippen and Hoe gave compelling testimony that Kuhia made clear and unequivocal threats to kill them which were accompanied by acts of intimidation. Kippen testified that Kuhia took off his shirt, inflated his chest, held up his clenched fists, and came at Kippen just before threatening to kill him. Hoe testified that Kuhia screamed at the top of his voice, exhibited early signs of rage, and was very animated while threatening to kill Hoe. Hoe further testified that Kuhia got to within inches of Hoe's face and blocked Hoe's path to prevent Hoe from leaving. When Hoe finally walked away, he "clearly expected" to be hit from behind by Kuhia.

The contemporaneous actions of Kippen and Hoe strongly corroborated their testimony of what had happened. Both expeditiously reported the threats to the police. While being threatened, Kippen retreated to the Archives Building and had a staff member call the police to secure protection from Kuhia. Hoe called the police the day after being threatened.

In addition, Kuhia had clear motives for threatening both Kippen and Hoe. Kuhia was angry and frustrated by the refusal of Kippen and OHA to accept his genealogical research and help him in the quiet title action. He was upset that Hoe had earlier kicked him out of a contested DHHL hearing.

In sharp contrast to the testimony of the alleged victims, Kuhia denied that he had made *any* threats against Kippen or Hoe. Regarding the Kippen incident, Kuhia testified that "no words were exchanged" with Kippen because Kuhia knew there was a restraining order in place. Regarding the Hoe encounter, Kuhia testified that he simply told Hoe he would "pursue legal action in a court of law," if he found out Hoe had something to do with his father's murder.

Given these circumstances and considering the record as a whole, we conclude that there is no reasonable possibility that any error in failing to give a "true threat" instruction may have contributed to Kuhia's convictions. As noted, the jury was provided with completely different versions of what had happened. For each count, the case boiled down to whether or not Kuhia made the alleged threats. Kuhia denied making any threats. He did not contest, however, that the alleged threats against Kippen and Hoe, if made, constituted "true threats" in that they conveyed a "gravity of purpose" and the "imminent prospect of execution." Nor did Kuhia dispute that the alleged threats were objectively capable of inducing a "reasonable fear of bodily injury in the person at whom the threat[s] [were] directed and who was aware of the circumstances under which the remarks were uttered." *See Id.* at 476, 24 P.3d at 672. The instructions the jury received required it to find that Kuhia "threatened ... to cause bodily injury to [the victim]," and "did so in reckless disregard of the risk of terrorizing that person." In convicting Kuhia under these instructions, the jury necessarily rejected Kuhia's version and accepted the testimony of Kippen and Hoe.

Under similar circumstances, appellate courts have found that any error in the trial court's jury instructions was harmless. *E.g., United States v. Pacione*, 950 F.2d 1348, 1355–56 (7th Cir.1991) (holding that failure to

**274**

give a "true threat" instruction was harmless where the primary issue at trial was whether the alleged threat was made, and the defendant did not contest that the statements, if made as alleged, constituted a true threat); *State v. Quintana*, 209 Conn. 34, 547 A.2d 534, 541 (1988) (holding that a defective self-defense instruction was harmless where the victim and the defense witness gave inconsistent versions of the stabbing, and the jury necessarily rejected the self-defense version presented by the defense).

In *Valdivia*, the fact that the defendant was handcuffed with his hands behind his back plainly created a disputed issue over whether the "imminency" requirement for a "true threat" had been satisfied. In other words, given the entire record, the jury could have reasonably differed on whether the defendant possessed the apparent ability to carry out the threat or whether the threat would reasonably tend to induce fear of bodily injury in the victim. Accordingly, the court held that the failure to instruct on the "imminency" requirement for a "true threat" was not harmless.

The circumstances here are much different. Unlike in *Valdivia*, there was no impediment to Kuhia's ability to immediately carry out his threats against Kippen or Hoe. Nor was there any suggestion that Kuhia's threats, as described by Kippen and Hoe, would not reasonably tend to induce fear in them. The only dispute was which version of the encounters the jury would believe. In finding Kuhia guilty, the jury necessarily accepted the alleged victim's version of each encounter and rejected Kuhia's version. In Kuhia's case, the giving of a "true threat" instruction would not have affected the jury's verdicts. Under the description of the encounters provided by Kippen and Hoe, there was no doubt that Kuhia's threats were "true threats," and any error in failing to give a "true threat" instruction was harmless.

## IV. CONCLUSION

The July 16, 2001 Judgment of the circuit court is affirmed.