113 P.3d 811

**STATE Of Hawai'i, Plaintiff–Appellee,**

v.

**Yong Ok PEGOUSKIE, Defendant–Appellant.**

**No. 25518.**

Intermediate Court of Appeals of Hawai'i.

May 20, 2005.

Certiorari Denied June 27, 2005.

Dennis W. Jung, Esq., on the briefs, Honolulu, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

WATANABE, Acting C.J., FOLEY, and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Yong Ok Pegouskie (Pegouskie) appeals from the Judgment entered on October 9, 2003, by the Honolulu Division of the District Court of the First Circuit (district court). Pegouskie was charged with two counts of prostitution, in violation of Hawaii Revised Statutes (HRS) § 712–1200 (1993 and 2004 Supp.), for alleged incidents occurring on January 8 and 9, 2002. After a bench trial, district court

Judge George Y. Kimura found Pegouskie guilty of the January 8, 2002, count and acquitted her of the January 9, 2002, count. Judge Kimura sentenced Pegouskie to a six-month term of probation and to pay a $500 fine and $25 to the Criminal Injury Compensation Fund.

On appeal, Pegouskie claims that: 1) the trial judge based his guilty verdict on factual findings that were clearly erroneous; 2) there was insufficient evidence that Pegouskie had offered or agreed to engage in sex with an undercover officer for a fee; 3) the trial judge's questioning of the undercover officer was improper and denied Pegouskie a fair trial; and 4) the prostitution statute, as applied to Pegouskie's conduct, violated her right to freedom of speech and was impermissibly vague and overbroad. We affirm.

## BACKGROUND

### A. The Parties' Questioning of Officer Tallion

Honolulu Police Department (HPD) Officer Jeffrey Tallion was the only witness called by the State of Hawai'i (the State) at trial. In response to questioning by the parties, Officer Tallion provided the following information.

Officer Tallion testified that he had been assigned to investigate complaints of prostitution activities at hostess bars. On January 8, 2002, Officer Tallion, wearing plain clothes and acting in an undercover capacity, went to a bar in Kalihi where Pegouskie worked as a hostess. He had been to this bar posing as a customer on several prior occasions. Pegouskie served Officer Tallion a beer and sat next to him in a booth.

Pegouskie asked Officer Tallion if he wanted to eat shrimp tempura. Officer Tallion replied that he did not eat seafood, but did eat "clams," which was street vernacular for "vagina." Pegouskie laughed. Officer Tallion asked Pegouskie if she knew what kind of clams he was talking about, and she replied, "Korean clams."

Officer Tallion told Pegouskie that he liked her bar, but that there was not enough "back room action." Pegouskie asked Officer Tallion what kinds of things he did at other places. Officer Tallion said he was "naughty" and would get "hand job[s], blow jobs, and have sex." Pegouskie asked Officer Tallion how much he paid for "hand jobs." Officer Tallion told her "$120." She laughed and informed Officer Tallion that he was getting ripped off.

Pegouskie asked Officer Tallion what he wanted to do. Officer Tallion replied that he wanted sex. Pegouskie said, "Oh, I thought you wanted a hand job," so Officer Tallion asked how much a hand job would cost. Pegouskie responded, "I thought you wanted sex." Officer Tallion then asked, "How much do you charge for sex?" Pegouskie said that the price was "$200." Officer Tallion left the bar a short time later.

The following evening, on January 9, 2002, Officer Tallion returned to the bar. Pegouskie again sat with Officer Tallion, and he bought her drinks. They were joined by another female known to Officer Tallion as "Jeanette," whose real name was Sun Ye Kim (Kim). In Pegouskie's presence, Kim asked Officer Tallion what happened to him the previous night since Pegouskie "was going to do you." Officer Tallion interpreted Kim's statement as meaning that Pegouskie had been ready to engage in sexual activity. Officer Tallion explained that he could not come back that night.

Officer Tallion then looked at Pegouskie and asked if it was still $200 for "everything," a word he testified was street vernacular for sexual intercourse and fellatio. Pegouskie replied "yes" and asked if Officer Tallion was ready to go to one of the back karaoke rooms. Officer Tallion told Pegouskie that he would have to come back on "pay day." Officer Tallion sat with Pegouskie for a while and then left the bar. Pegouskie walked him outside. Officer Tallion again asked Pegouskie if it was going to be $200 for "everything." Pegouskie answered "yes," and Officer Tallion said he would be back on Friday.

### B. The Trial Judge's Questioning of Officer Tallion

After the parties' examination of Officer Tallion had been completed, the trial judge

asked Officer Tallion a series of questions about Pegouskie's alleged offer to have sex on January 8, 2002. The judge's questions included the following:

Q. Okay .... then she said what do you want to do, and you said sex, correct?

A. Yes, sir.

Q. And she said, I thought you wanted a hand job, correct?

A. Correct, sir.

Q. And she asked you, you want sex. Then what happened?

A. After she goes I thought you wanted a hand job, I tried to get her price for a hand job.

Q. Okay.

A. And I never got the price for a hand job.

Q. You asked her for a price for the hand job?

A. Yes. And then the conversation went back to sex.

Q. Okay.

A. And I asked how much do you charge for sex. And at that time, she said, are you serious, and I said yes. And then she said oh, it will be $200. So I confirmed $200 for sex, and she replied yes.

Q. Okay. Did you agree to it?

A. I agreed to it, yeah.

Q. How did you agree to it?

A. I said okay—I—when I confirmed—

Q. What did you say?

A. I said oh, okay. I—

Q. I'm not interested in conclusions.

A. Something to the effect of oh, okay.

Q. When she said $200?

A. For sex, yes.

The trial judge also asked Officer Tallion about his testimony concerning the January 9, 2002, prostitution charge, including the following questions:

Q. And you testified—now, I'm very confused. You said $200—that the words $200 "for everything," in quote, means, from your experience, fellatio, as well as sex.

A. Fellatio, and sex, yes, sir.

Q. Was the fellatio in the agreement—in the offer—alleged offer and acceptance on January 8th?

A. No, sir.

Q. Just sex.

A. Yes, sir.

Q. So fellatio is just a fringe benefit.

A. In other investigations, other hostesses, streetwalkers, use "everything" as both.

Q. Okay. Did Miss—did the defendant mention "everything"?

A. When I asked is it still $200 for "everything", she said yes.

Q. So that would include fellatio.

A. if she knows it to be that.

## C. The Defense Case

The defense called Kim, who testified that she was a bartender at the bar that employed Pegouskie. Kim denied ever telling Officer Tallion that Pegouskie "was going to do you."

Pegouskie testified in her own defense. She stated that she worked as a hostess at the bar and that Officer Tallion sat with her and bought her drinks on six or seven occasions. Pegouskie testified that she never said anything to Officer Tallion that would lead him to think that she agreed to have sex with him.

The trial judge briefly questioned Pegouskie after the parties completed their examination. The judge's examination included the following:

Q. ... [Y]ou know what the words "for everything" mean?

A. I know what "everything" means.

Q. The term "for everything", what does it mean?

A. You mean from their?

Q. What does it mean to you?

A. Depends on what you talking about everything.

Q. So if he said $200 "for everything", what does "for everything" mean to you? Do you know?

A. Not really.

## D. The Trial Judge's Decision

After the close of the evidence, the trial judge convicted Pegouskie of the January 8, 2002, prostitution charge, finding that Pegouskie had agreed to have sex for a fee. The judge acquitted Pegouskie of the January 9, 2002, charge, finding that the government failed to establish a meeting of the minds necessary for a contract or agreement. The judge noted that on January 9th, the phrase "for everything," as opposed to the term "sex," was used. The judge determined that while in Officer Tallion's mind "for everything" meant fellatio plus sex, "in [Pegouskie's] mind, she didn't know what it mean[t]."

## DISCUSSION

### A. The Trial Judge's Factual Findings Were Not Clearly Erroneous and There Was Substantial Evidence to Support the Judge's Guilty Verdict.

Pegouskie was convicted of prostitution under HRS § 712–1200, which provides in relevant part that "[a] person commits the offense of prostitution if the person engages in, or agrees or offers to engage in, sexual conduct with another person for a fee." Prior to announcing his verdicts, the trial judge made oral factual findings, including the following findings relevant to the January 8, 2002, charge:

> And then [Pegouskie] said, what would you want to do. And [Officer Tallion] said sex. And she said, I thought you wanted a hand job. And he said he changed his mind. Said do you want sex. He said yes. Agreed on a consideration of $200. And he said he confirmed this. There was agreement, in his eyes.

The judge found Pegouskie guilty of the January 8, 2002, charge because there was "an agreement [to engage in sexual conduct], and the consideration was for a fee."

On appeal, Pegouskie claims that the trial judge's factual findings that she asked Officer Tallion if he wanted sex and that they agreed on a fee of $200 were clearly erroneous. She also claims that there was insufficient evidence to support her conviction. We review a trial court's factual findings under the clearly erroneous standard of review. *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994).

> A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.

*State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation and internal quotation marks omitted).

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution. *State v. Ildefonso*, 72 Haw. 573, 576, 827 P.2d 648, 651 (1992).

> The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

> "Substantial evidence" . . . is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion. And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.

*State v. Pone*, 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995), (quoting *State v. Batson*, 73 Haw. 236, 248–49, 831 P.2d 924, 931, *reconsideration denied*, 73 Haw. 625, 834 P.2d 1315 (1992)). It is the province of the trial judge, not the appellate courts, to determine the credibility of witnesses and the weight of the evidence. *State v. Eastman*, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996).

Pegouskie's challenge to the trial judge's factual findings and the sufficiency of the evidence for her conviction are based on the same contention—that there was no substantial evidence that she offered or agreed to engage in sex with Officer Tallion for a fee.

Pegouskie argues that the evidence only showed that she advised Officer Tallion that she *charged* $200 for sex and not that she *offered or reached an agreement* with him to have sex for that price. We disagree.

The context of the conversation between Officer Tallion and Pegouskie on January 8, 2002, was clearly sexual in nature. Officer Tallion testified that he told Pegouskie that he was getting hand jobs, blow jobs, and sex at other bars. Pegouskie advised him that $120 was too much to pay for a hand job. Pegouskie then asked Officer Tallion what he wanted to do. Officer Tallion said he wanted sex. When Officer Tallion asked how much a hand job would cost, Pegouskie replied, "I thought you wanted sex." Officer Tallion asked, "How much do you charge for sex?" Pegouskie responded "$200." Officer Tallion testified that when Pegouskie said it was $200 for sex, he "agreed to it."

Officer Tallion's testimony regarding his conversation with Pegouskie on January 8, 2002, provided substantial evidence that Pegouskie had made an offer to engage in sex with Officer Tallion for a fee which he had accepted, resulting in an agreement. In addition, what happened when Officer Tallion returned to the bar the following evening provided corroborating evidence of Pegouskie's illicit offer and agreement. In Pegouskie's presence, Kim asked Officer Tallion what happened to him the previous night since Pegouskie was "going to do you." Pegouskie confirmed that the price was still $200 "for everything" and asked Officer Tallion if he was ready to go to one of the back rooms. This evidence shows that Pegouskie's discussion with Officer Tallion the previous evening was more than a mere price quote for sex, but was a bona fide offer and agreement to engage in sex for $200.

We conclude that the trial judge's factual findings pertaining to Pegouskie's offer and agreement to engage in sex for $200 were not clearly erroneous and that there was sufficient evidence to support Pegouskie's prostitution conviction. We specifically reject Pegouskie's suggestion that the trial judge's factual findings were erroneous because they did not track the testimony of Officer Tallion word for word. While not a verbatim recitation of Officer Tallion's testimony, the trial judge's findings reflected the substance and import of the officer's testimony.

## B. The Trial Judge's Questioning of the State's Witness Did Not Deprive Pegouskie of a Fair Trial.

■ Pegouskie claims that the trial judge's questioning of Officer Tallion deprived her of a fair trial. She contends that the judge's questions were intended to remedy shortcomings in the State's evidence and demonstrate that, instead of being impartial, the judge took on the role of a prosecutor.

### 1. Applicable Law

■ The propriety of a trial judge's questioning of a witness is normally reviewed for abuse of discretion. *State v. Sprattling,* 99 Hawai'i 312, 322, 55 P.3d 276, 286 (2002). Pegouskie, however, did not object below to the trial judge's questioning of Officer Tallion. We therefore review her claim under the plain error standard of review. Under this standard, we will vacate or reverse a conviction only where necessary "to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory,* 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (quoting *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998)).

A trial judge's right "both to call and to question witnesses has long been recognized as fundamental in the Anglo–American adversary system." Commentary to Hawaii Rules of Evidence (HRE) Rule 614 (1993) (citing McCormick, Evidence, § 8 (2d ed.1972) and 9 Wigmore, Evidence § 2484 (3d ed.1940)). HRE Rule 614 provides in pertinent part that:

> **Rule 614 Calling and interrogation of witness by court.** (a) Calling by court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

(b) Interrogation by court. The court may interrogate witnesses, whether called by itself or a party.

■ The Hawai'i Supreme Court has recognized that "a trial judge has the right to examine witnesses to elicit pertinent material facts not brought out by either party or to clarify testimony." *State v. Schutter*, 60 Haw. 221, 222, 588 P.2d 428, 429 (1978). This power is necessary to fulfill the truth-seeking function of judicial proceedings. *Id.*

■ A trial judge's power to question witnesses, however, is not unlimited. *Id.* A trial judge must not assume the role of an advocate for either party. *Id.* While a judge may examine a witness at some length, the judge may not conduct an "unduly extended" examination of any witness. *Id.* In a jury trial, the judge should not by his or her questioning indicate to the jury the judge's opinion on the merits of the case or the judge's bias towards or disbelief of a witness. *Id.* at 222–23, 588 P.2d at 429. In jury-waived trials, the judge is accorded considerably greater discretion. *State v. Hutch*, 75 Haw. 307, 326 n. 8, 861 P.2d 11, 21 n. 8 (1993).

> In such cases, it is the judge who is the trier of fact, and, accordingly, there is no possibility of jury bias; under the circumstances, the judge's duty to clarify testimony and fully develop the truth in the case becomes particularly heightened.

*Id.*

## 2. Discussion

Applying these principles, we conclude that the trial judge did not overstep permissible bounds in questioning Officer Tallion. The trial judge's questions sought pertinent and material information about whether Pegouskie's conversations with Officer Tallion constituted offers or agreements to engage in sex for a fee. The bulk of the judge's questions sought to clarify testimony the parties had

elicited. The trial judge did not take on the role of an advocate. Rather, the judge's questions were directed at ascertaining the truth and understanding the interaction between Pegouskie and Officer Tallion. Especially in the context of a bench trial, where "the judge's duty to clarify testimony and fully develop the truth … becomes particularly heightened," we conclude that the judge's questioning of Officer Tallion was permissible. *Id.*

We reject Pegouskie's claim that the judge's questioning shows that he was biased against her. Pegouskie focuses on the judge's questioning Officer Tallion about whether he had agreed to her offer of sex for $200 on January 8, 2002. Pegouskie notes that neither party had asked Officer Tallion about his agreement to the offer; that in response to the judge's question, Tallion testified he had expressed his agreement to the offer; and that the judge relied on this testimony in finding Pegouskie guilty of the January 8, 2002, charge. The trial judge, however, also relied on answers to questions he posed in acquitting Pegouskie of the January 9, 2002, charge.[1] The judge's even-handed use of testimony elicited by his questions and his acquittal of Pegouskie on the January 9, 2002, charge undermines Pegouskie's claim of judicial bias.

■ Pegouskie argues that the trial judge's questioning was improper because without Officer Tallion's answers to the judge's questions, there was insufficient evidence to convict. Under Hawai'i law, a trial judge may question witnesses to elicit relevant and material facts that were not brought out by either party. *Schutter*, 60 Haw. at 222, 588 P.2d at 429; *Sprattling*, 99 Hawai'i at 322, 55 P.3d at 286. Pegouskie cites no authority for the proposition that a judge is prohibited from asking questions that elicit testimony necessary to prove an essential element. Courts from other juris-

1. Honolulu Police Department Officer Jeffrey Tallion testified that he used the words "for everything," which he understood to mean sexual intercourse and fellatio, during his January 9, 2002, encounter with Defendant–Appellant Yong Ok Pegouskie (Pegouskie). When questioned by the trial judge, Pegouskie testified that she did not know what "for everything" meant. The trial judge also asked Officer Tallion whether Pegouskie had mentioned the word "everything." Officer Tallion did not say that Pegouskie had used this word or understood what it meant. The judge cited the absence of a meeting of the minds over the meaning of the phrase "for everything" in finding that the prosecution had failed to prove the January 9, 2002, charge.

dictions have upheld questioning by trial judges in this situation. *E.g., Mills v. State,* 383 N.W.2d 574, 576–78 (Iowa 1986); *Carrado v. United States,* 210 F.2d 712, 722 (D.C.Cir.1953).

We reject Pegouskie's argument because it is founded on an erroneous premise. Contrary to Pegouskie's contention, Officer Tallion's testimony, prior to the judge's questioning, was sufficient to prove that Pegouskie had offered to engage in sex for $200, thereby committing the offense of prostitution. Officer Tallion's answers to the judge's questions regarding whether Officer Tallion had agreed to the offer were not necessary to establish the offense.

This court's decision in *State v. Silva,* 78 Hawai'i 115, 890 P.2d 702 (App.1995) is distinguishable. In *Silva,* the trial judge asked 110 questions of a prosecution witness in a simple misdemeanor assault case. *Id.* at 118, 120, 890 P.2d at 705, 707. After examining the trial judge's questions, this court concluded that the questions were "not aimed at clarifying certain points but [at] confirming the necessary elements of the crime," and that the nature and extent of the trial judge's questioning "demonstrate[d] that the court assumed the role of a prosecutor, thus failing to act impartially." *Id.*

In Pegouskie's case, the trial judge asked approximately 35 questions of Officer Tallion which were directed at clarifying and assisting the judge in understanding Officer Tallion's previous testimony. Unlike in a simple assault case, parties discussing an offer or agreement to engage in sex for a fee often use innuendo and street vernacular. *See, e.g., State v. Connally,* 79 Hawai'i 123, 899 P.2d 406 (App.1995). Therefore, the trial judge in a prostitution case may need greater latitude to ask questions to avoid confusion over the meaning of terms used by witnesses. Moreover, in contrast with *Silva,* our review of the record in Pegouskie's case does not show that the trial judge assumed the role of a prosecutor or failed to act impartially.

**C. Pegouskie's Prostitution Conviction Did Not Violate Her Constitutional Rights.**

■ Pegouskie contends that the prostitution statute, HRS § 712–1200, as applied to

her conduct, violated her right to freedom of speech and was impermissibly vague and overbroad. Pegouskie did not raise her constitutional claims in the trial court, and we therefore review for plain error. Having considered her claims, we conclude that they are devoid of merit.

■ The constitutionality of a statute is a question of law that we review under the right/wrong standard. *State v. Lee,* 75 Haw. 80, 90, 856 P.2d 1246, 1253 (1993). The Hawai'i Supreme Court has consistently held that "(1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." *Convention Ctr. Auth. v. Anzai,* 78 Hawai'i 157, 162, 890 P.2d 1197, 1202 (1995) (internal quotation marks and brackets omitted).

■ A criminal statute is unconstitutionally vague if it fails to define the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513, 525, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994) (quoting *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)); *see also State v. Richie,* 88 Hawai'i 19, 31, 960 P.2d 1227, 1239 (1998). A statute is overbroad when it sweeps so broadly that its proscriptions include constitutionally protected conduct as well as unprotected conduct. *Richie,* 88 Hawai'i at 32, 960 P.2d at 1240.

**1. Pegouskie's Free Speech Claim**

A defendant commits the crime of prostitution under HRS § 712–1200 by engaging in, or agreeing or offering to engage in, sexual conduct with another for a fee. Pegouskie does not dispute that the Hawai'i Legislature has the authority to prohibit prostitution or that HRS § 712–1200 is based on legitimate and important governmental interests. Pegouskie, however, contends that convicting her of prostitution based on her "mere

words" infringed on her constitutional rights to freedom of speech. We disagree.[2]

The First Amendment to the United States Constitution does not protect speech which is part of a course of criminal conduct. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949); *Cox v. Louisiana*, 379 U.S. 559, 563, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). In *Giboney*, the United States Supreme Court stated:

> It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now.

*Giboney*, 336 U.S. at 498, 69 S.Ct. 684.

The trier of fact found that Pegouskie had agreed to engage in sex for $200. Pegouskie's words were an integral part of her conduct in violating a valid statute prohibiting offers or agreements to engage in sex for a fee. Her prosecution did not violate the First Amendment. Under statutes very similar to Hawai'i's prostitution statute, courts in other jurisdictions have routinely rejected First Amendment challenges to convictions based on offers or agreements to engage in sex for money. *E.g., People v. Johnson*, 60 Ill.App.3d 183, 17 Ill.Dec. 382, 376 N.E.2d 381, 385–86 (1978); *State v. Allen*, 37 Conn. Supp. 506, 424 A.2d 651, 654–55 (1980); *Wood v. United States*, 498 A.2d 1140, 1143–44 (D.C.1985).

**2. Pegouskie's Vagueness and Overbreadth Claims**

■ The fallacy in Pegouskie's vagueness and overbreadth arguments is that she assumes she was convicted based on her version of what happened rather than the facts found by the trial judge. Pegouskie's version is that she did not offer to have sex with Officer Tallion, but only quoted him a price for sex, and that any reference to engaging

in sex for $200 was a joke. The trial judge, however, rejected Pegouskie's version in finding that she had agreed to engage in sex with Officer Tallion for a fee.

If Pegouskie's version of what happened were true, she would not have violated HRS § 712–1200. The statute does not prohibit a person from quoting a price for sex that does not amount to an offer, nor does it prohibit a joking reference to engaging in sex for a fee. Thus, Pegouskie's conviction does not show that HRS § 712–1200 is overbroad, but only that her version of what happened was not credible. HRS § 712–1200 does not proscribe constitutionally protected conduct and was not overbroad as applied to Pegouskie's actual conduct.

■ Pegouskie also has no basis to challenge the application of HRS § 712–1200 to her conduct on the ground of vagueness. The language of HRS § 712–1200 is sufficiently clear that she was not required to guess at its meaning. The statute gave her fair warning that she was prohibited from offering or agreeing to engage in sex for a fee. *Richie*, 88 Hawai'i at 31–32, 960 P.2d at 1239–40.

Pegouskie's real dispute is not with the reach or clarity of HRS § 712–1200, but with the trial judge's assessment of the evidence. We have already resolved that dispute against Pegouskie in concluding that there was substantial evidence to support her conviction.

## CONCLUSION

We affirm the October 9, 2003, Judgment of the district court.

---

2. Pegouskie raises her free speech claim under both Article I, Section 4 of the Hawai'i Constitution and the First Amendment to the United States Constitution. In *State v. Viglielmo*, 105 Hawai'i 197, 212–13, 95 P.3d 952, 967–68 (2004), the Hawai'i Supreme Court held that Article I, Section 4 of the Hawai'i Constitution

did not afford the defendant any greater protection than the First Amendment in the context of a trespass prosecution. Pegouskie has provided no compelling reason in her case to apply Article I, Section 4 of the Hawai'i Constitution more broadly than the First Amendment, and we decline to do so.