210 P.3d 9

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Mariko Davis BEREDAY, Defendant–Appellant**

No. 28369.

Intermediate Court of Appeals of Hawai'i.

May 7, 2009.

Gary Victor Dubin, (Dubin Law Offices), Honolulu, on the briefs, for Defendant–Appellant.

Daniel H. Shimizu, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

RECKTENWALD, C.J., NAKAMURA, and FUJISE, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Mariko Davis Bereday (Bereday) appeals from two December 18, 2006, Judgments [1] entered by the District Court of the First Circuit (district court).[2] Bereday was orally charged with two counts of negligent failure to control a dangerous dog, in violation of the Revised Ordinances of Honolulu (ROH) § 7–7.2 (1990 & Supp. No. 7, 8–05 & Supp. No. 12, 2–08).[3] The charges

---

1. The Judgments are dated December 15, 2006, but were filed on December 18, 2006.

2. The Honorable James Dannenberg presided.

3. ROH § 7–7.2 provides in pertinent part:

   **Sec. 7–7.2 Prohibited acts—Conditions on owner—Penalties.**

   (a) A dog owner commits the offense of negligent failure to control a dangerous dog, if the owner negligently fails to take reasonable measures to prevent the dog from attacking, without provocation, a person or animal and

such attack results in: (1) the maiming or causing of serious injury to or the destruction of an animal or (2) bodily injury to a person other than the owner. A person convicted under this subsection shall be guilty of a petty misdemeanor for a first offense and a misdemeanor for a subsequent offense and sentenced in accordance with subsections (c), (d), and (e).

   (b) For the purposes of this section, "reasonable measures to prevent the dog from attacking" shall include but not be limited to: (1) measures required to be taken under

were based on allegations that Bereday negligently failed to prevent her dog, a Rottweiler named "Bobo," from attacking and biting a two-year-old boy and a five-year-old girl in separate incidents on May 8, 2005, and May 13, 2005, at a beach in Kahala.

After a bench trial, Bereday was found guilty as charged on both counts. With respect to the May 8th offense (Case No. 1P105–07481), the district court sentenced Bereday to six months of probation, with the condition that she perform 100 hours of community service, and ordered her to pay a $2,000 fine. The district court further ordered the humane destruction of Bobo. With respect to the May 13th offense (Case No. 1P105–07480), the district court sentenced Bereday to six months of probation, with the conditions that she serve five days in jail and perform 200 hours of community service, and ordered her to pay a $2,000 fine. The district court stayed Bereday's sentence pending appeal.

On appeal, Bereday argues that: 1) the City and County of Honolulu (the City) lacked enforcement jurisdiction over her offenses; 2) there was insufficient evidence to support her convictions; 3) ROH § 7–7.2(a), the ordinance under which she was convicted, is unconstitutionally vague and ambiguous; 4) the district court erred in denying her motion to sever the charges; and 5) the district court's imposition of a jail sentence and ordering the destruction of Bobo were unduly harsh and constituted an abuse of discretion.

For the reasons set forth in greater detail below, we conclude that Bereday's first four arguments are without merit, and we therefore affirm her convictions. With respect to

Bereday's sentencing claims, we conclude that for Bereday's May 13th offense, the district court was authorized to impose either a term of probation or imprisonment, but not both. The district court therefore erred in ordering Bereday to serve five days in jail as a condition of her six-month term of probation. We vacate Bereday's sentence on the May 13th offense and remand the case for resentencing on that offense. During the pendency of this appeal, we received notice that Bobo had died of natural causes. Thus, Bereday's claim that the district court erred in ordering the humane destruction of Bobo is moot. We affirm Bereday's sentence on the May 8th offense.

## BACKGROUND

### I.

On May 8, 2005, Veronica Tomooka (Tomooka) went to a beach in Kahala, on the island of Oahu, with Keeli, her four-year-old daughter, and Keeton, her two-year-old son. They were later joined by Tomooka's friend, Grant Wong (Wong). Bereday arrived at the beach about a half hour after Tomooka. Bereday came with her two unleashed dogs, a black Rottweiler and a beige-colored dog.

Tomooka did not know Bereday, but Bereday came over and they struck up a conversation that lasted about fifteen minutes. At one point, Keeton attempted to pet the Rottweiler, but Bereday told Keeton to stop. Keeton complied and did not touch the Rottweiler. Bereday said goodbye to Tomooka and attempted to leave, but the Rottweiler, who was sitting in front of Tomooka and her children, refused to budge. Bereday called the Rottweiler, whose name, Tomooka testified, started with the letter "B," but the dog

Article 4 of this chapter to prevent the dog from becoming a stray; and (2) any conditions imposed by the court for the training of the dog or owner or for the supervision, confinement or restraint of the dog for a previous conviction under this section.

(c) A dog owner convicted under subsection (a) shall be sentenced to the following without possibility of suspension of sentence:

(1) A fine of not less than $500 nor more than $2,000; except that if the offense occurred within five years of a previous conviction under this section, a fine of not less than $ 1,000 nor more than $2,000;

(2) A period of imprisonment of up to 30 days, or in lieu of imprisonment, a period of probation of not more than six months in accordance with the procedures, terms and conditions provided in HRS [ (Hawaii Revised Statutes) ] Chapter 706, Part II; except that if the offense occurred within five years of a previous conviction under this section, a period of imprisonment of up to six months, or in lieu of imprisonment, a period of probation of not more than one year[.]

ignored Bereday's verbal commands. The Rottweiler also resisted when Bereday tried to move it by pulling on its collar. After several minutes, Bereday finally got the Rottweiler to move, and they walked toward the exit from the beach.

The Rottweiler's refusal to move made Tomooka uneasy, and she waited to give Bereday time to leave the beach. After waiting ten or fifteen minutes, Tomooka, Wong, and the children prepared to leave. As they walked along the beach toward the exit, Tomooka saw the Rottweiler next to Bereday, behind some bushes. Wong walked past the Rottweiler without incident. Suddenly, the Rottweiler ran out of the bushes and attacked Keeton. The Rottweiler knocked Keeton down and kept trying to bite Keeton as Keeton rolled into the water. Bereday yelled at the Rottweiler to stop but the dog did not obey. A male bystander intervened and had to punch the dog in the face four or five times before it finally let go of Keeton. Keeton was crying, and he sustained puncture wounds to his back and side and bruises on his arm. Stitches were required to close his wounds. Keeton had not looked at, said anything to, or done anything toward the dog immediately before he was attacked.

Honolulu Police Department (HPD) Officer Eric Fontes (Officer Fontes) responded to the scene and observed "the mother . . . with her child [who] had sustained injuries due to a dog bite." Officer Fontes was advised by another HPD officer about a woman named "Mari" who frequented the beach with a Rottweiler. Officer Fontes went to Bereday's home that same day and noticed a Rottweiler, wet and covered in sand, running loose in the garage area.

## II.

On May 13, 2005, Don Hamataki (Hamataki) took Yuri, his five-year-old daughter, and his son to Kahala Beach. Hamataki became acquainted with Bereday that day due to an incident at the beach. Hamataki's children entered the water, and Hamataki noticed Bereday lying on the sand about sixty yards away with a white dog and a big, black Rottweiler that had brown around the eyes. The Rottweiler had a collar but no leash.

While Yuri was lying on a boogie board in two-and-one-half feet of water, Hamataki noticed the Rottweiler heading towards Yuri. Hamataki attempted to get between the Rottweiler and his daughter to protect her as the dog swam toward Yuri. The Rottweiler got past Hamataki and bit Yuri on the hip, "lock[ing] on to her." Yuri screamed. Hamataki stuck his hands in the Rottweiler's mouth and was able to get the dog off of Yuri. Bereday called the Rottweiler's name, which Hamataki thought was "Bobo," and the dog went back to Bereday on the beach. Yuri had not approached or said anything to the Rottweiler prior to being attacked.

Hamataki called 911, and an ambulance took Yuri to the emergency room. Yuri sustained bite wounds to her left pelvis and buttock which required stitches.

HPD Officer Mitchell Tomei (Officer Tomei) responded to a report of a dog bite in the Kahala Beach area. Officer Tomei talked to the father of a girl who was in the ambulance being treated. Officer Tomei saw a woman with two dogs, one of which was a large, black dog, further down the beach but was unable to catch up to them. Officer Tomei was familiar with Bereday and later went to her residence. There were many animals at the residence, and Officer Tomei believed he saw the black dog he had previously seen at the beach.

On May 13, 2005, Hawaiian Humane Society Investigator Ryan Vaughn (Vaughn) went to Bereday's residence in response to a report of a dog bite on Kahala Beach involving a young girl. There were six or seven dogs at Bereday's house, but only one that appeared to be a Rottweiler. The Rottweiler, which Vaughn referred to as "Bobo," growled and displayed aggressive behavior. Vaughn issued a renewed license to Bereday for the Rottweiler because the dog's license had expired. The prosecution introduced records showing that a license for a Rottweiler named "Bobo" had been issued to Bereday, with a registration date of May 13, 2005.

## III.

Prior to the May 8th and May 13th attacks, Bereday had two encounters with a woman named Teri Marcus (Marcus) and Marcus's dog, Sophie, at Kahala Beach. In 1999, Marcus threw a coconut into the water for Sophie to fetch, and Bereday's dogs, including a big Rottweiler, also ran into the water. The Rottweiler growled at Sophie. About a month later, Marcus again encountered Bereday at the beach. Bereday had with her the Rottweiler named Bobo and at least one other dog. Bereday told Marcus, "[Y]ou better put your dog on a leash cause my dogs aren't friendly."

## DISCUSSION

### I.

#### A.

Bereday argues that because the alleged dog attacks took place while the children were in ocean water, the City lacked "enforcement jurisdiction" over this case. In particular, Bereday argues that the State of Hawai'i has reserved to itself jurisdiction over ocean waters to be exercised by the Department of Land and Natural Resources, and therefore, the City had no authority to enforce ROH § 7–7.2 against her. We disagree.

■ Hawaii Revised Statutes (HRS) § 46–1.5 (Supp.2008) sets forth the general powers and limitations of each county in the State of Hawai'i, including the City. During the time relevant to this case, HRS §§ 46–1.5(13) and (14) (Supp.2004) provided in pertinent part:

Subject to general law, each county [4] shall have the following powers and shall be subject to the following liabilities and limitations:

. . . .

(13) *Each county shall have the power to enact ordinances deemed necessary to protect health, life, and property, and to preserve the order and security of the county and its inhabitants on any subject or matter not inconsistent with, or tending to defeat, the intent of any state statute, provided also that the statute does not disclose an express or implied intent that the statute shall be exclusive or uniform throughout the State.*

(14) *Each county shall have the power to make and enforce within the limits of the county all necessary ordinances covering: all local police matters;* . . . and to fix a penalty for the violation of any ordinance, which penalty may be a misdemeanor, petty misdemeanor, or violation as defined by general law.

(Emphasis added.)[5] Pursuant to this statutory grant of authority, the City had the power to enact and enforce ROH § 7–7.2, which makes it a crime for a dog owner to negligently fail to control a dangerous dog.

■ With respect to the City's territorial limits, HRS § 4–1 (Supp.2008) divides the island of Oahu for "city" and "county" purposes into districts. "Each of the[se] districts includes archipelagic waters and smaller islands adjacent thereto." HRS § 4–3 (1993). The Revised Charter of the City and County of Honolulu (Revised Charter) provides that the City includes the island of Oahu and "waters adjacent thereto." Revised Charter § 1–102 (2000) ("The island of Oahu and all other islands in the State of Hawaii, not included in any other county and waters adjacent thereto, shall constitute the City and County of Honolulu.").[6] The Re-

---

4. HRS § 1–22 (1993) provides that "[t]he word 'county' includes the city and county of Honolulu."

5. HRS §§ 46–1.5(13) and (14) (Supp.2004) were subsequently amended in 2005 and 2007 in ways not material to this appeal by 2005 Haw. Sess. Laws Act 163, § 1 at 409–10 and 2007 Haw. Sess. Laws Act 249, § 6 at 781–82.

6. We note that the placement of the commas in Revised Charter § 1–102 creates a possible ambi-

guity over whether the phrase "waters adjacent thereto" modifies both "[t]he island of Oahu and all other islands ... not included in any other county" or just "all other islands ... not included in any other county." We reject the latter interpretation because it would lead to absurd results. *See Tauese v. State, Dep't of Labor & Indus. Relations,* 113 Hawai'i 1, 31, 147 P.3d 785, 815 (2006) (stating that courts are "bound to construe statutes so as to avoid absurd results" (citation omitted)); *Keliipuleole v. Wilson,* 85 Hawai'i 217, 222, 941 P.2d 300, 305 (1997)

vised Charter § 2–101 (2000) further provides that in addition to the powers enumerated in the City's charter, the City "shall have and may exercise all powers it would be competent for this charter to enumerate expressly."

■ Because the two dog attacks occurred in shallow water, very close to the shoreline of an Oahu beach, the attacks clearly took place within the waters and archipelagic waters adjacent to the island of Oahu and thus within the City's territorial limits. Accordingly, we conclude that the City had the authority to enforce the violations of ROH § 7–7.2 that Bereday was charged with committing in this case. We further conclude that the district court had jurisdiction over this case pursuant to HRS § 604–8 (Supp. 2008), which grants the district courts jurisdiction over criminal offenses punishable by fine or imprisonment not exceeding one year.

### B.

### 1.

■ We reject Bereday's claim that the City lacked enforcement jurisdiction over this case because the State of Hawaiʻi reserved the exercise of jurisdiction over ocean waters to the Department of Land and Natural Resources (DLNR) pursuant to HRS § 171–3 (Supp.1999). HRS § 171–3(a) provides in relevant part that "[t]he [DLNR] shall manage, administer, and exercise control over public lands, the water resources, *ocean waters*, navigable streams, coastal areas (excluding commercial harbor areas), and minerals and all other interests therein...." (Emphasis added.)[7] The term "ocean waters" is defined by HRS § 200–1 (1993) to mean "all waters seaward of the shoreline within the jurisdiction of the State."

In effect, Bereday argues that the City's ordinance, ROH § 7–7.2, is preempted by the statutory authority granted to DLNR by HRS § 171–3 to manage and exercise control over ocean waters. We disagree.

As noted, HRS § 46–1.5(13) grants each county the

> power to enact ordinances deemed necessary to protect health, life, and property, and to preserve the order and security of the county and its inhabitants *on any subject or matter not inconsistent with, or tending to defeat, the intent of any state statute, provided also that the statute does not disclose an express or implied intent that the statute shall be exclusive or uniform throughout the State.*

(Emphasis added.) The Hawaiʻi Supreme Court has construed HRS § 46–1.5(13) to mean that "a municipal ordinance may be preempted pursuant to HRS § 46–1.5(13) if (1) it covers the same subject matter embraced within a comprehensive state statutory scheme disclosing an express or implied intent to be exclusive and uniform throughout the state or (2) it conflicts with state law." *Richardson v. City & County of Honolulu*, 76 Hawaiʻi 46, 62, 868 P.2d 1193, 1209 (1994). Neither of the tests for preemption are met in this case.

The subject matter covered by ROH § 7–7.2 is the protection of the public against harm caused by dangerous dogs anywhere within the City's territorial limits by imposing criminal sanctions on dog owners who negligently fail to control their dangerous dogs. ROH § 7–7.2 is not aimed at regulating activities or managing resources within ocean waters. In addition, Bereday has not identified any DLNR-related statute or DLNR rule that purports to regulate the conduct of owners of dangerous dogs in ocean waters through criminal sanctions. Accordingly, ROH § 7–7.2 does not cover the

(stating that "legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality" (citation and brackets omitted)); *Richardson v. City & County of Honolulu*, 76 Hawaiʻi 46, 60, 868 P.2d 1193, 1207 (1994). It would be nonsensical and illogical for the Revised Charter to include within the City's territorial limits waters adjacent to islands not in any other county, but to exclude waters adjacent to the main island of Oahu. Excluding waters adja-

cent to Oahu from the City's territorial limits would also be inconsistent with HRS §§ 4–1 and 4–3 which divide the island of Oahu for city and county purposes into districts that include adjacent archipelagic waters.

7. HRS § 171–3 (Supp.1999) was amended in 2008 in ways not material to this appeal. 2008 Haw. Sess. Laws Act 233, § 16 at 865–66.

same subject matter embraced by DLNR's authority to manage and control ocean waters pursuant to HRS § 171–3, and ROH § 7–7.2 does not conflict with state law. *See Richardson,* 76 Hawai'i at 62–67, 868 P.2d at 1209–14 (holding that city ordinance relating, *inter alia,* to residential condominium leasehold conversion was not preempted by state law); *Pac. Int'l Servs. v. Hurip,* 76 Hawai'i 209, 215–19, 873 P.2d 88, 94–98 (1994) (holding that city ordinance imposing insurance coverage requirements on car rental businesses was not preempted by state no-fault insurance law); *State v. Ewing,* 81 Hawai'i 156, 160–63, 914 P.2d 549, 553–56 (App.1996) (holding that city ordinance prohibiting the public use of a device to reproduce excessively loud sounds was not preempted by state statute and regulations regarding noise pollution).

Moreover, under analogous circumstances, the Hawai'i Supreme Court held that the grant to the Department of Hawaiian Home Lands (DHHL) of exclusive control over the management and disposition of Hawaiian home lands did not preclude the enforcement of State and county criminal laws on such lands. *State v. Jim,* 80 Hawai'i 168, 171–72, 907 P.2d 754, 757–58 (1995). In *Jim,* the defendants were convicted of criminal trespass for refusing to leave a shopping center situated on Hawaiian home lands. *Id.* at 169–70, 907 P.2d at 755–56. The supreme court noted that pursuant to the Hawaiian Homes Commission Act (HHCA), the DHHL has "exclusive control" over Hawaiian home lands. *Id.* at 171, 907 P.2d at 757.

The defendants contended that State and county officials did not have authority to make arrests on Hawaiian home lands and that the district court lacked jurisdiction to entertain their alleged criminal violations. *Id.* at 170, 907 P.2d at 756. In particular, defendants claimed "that the absence of express authorization under the HHCA prohibits State and county officials from making arrests on Hawaiian home lands until Congress agrees to an appropriate amendment of

the HHCA under section 4 of the Admission Act." *Id.*

In rejecting the defendants' claim, the supreme court held:

> The exercise of the State's inherent police power does not necessarily conflict with the [DHHL's] responsibility to manage and dispose of [Hawaiian home] lands. Consequently, we reject the [defendants'] claim that the contract clause, *see* U.S. Const. art. I, § 10 ("No State shall … pass any Law impairing the Obligation of Contracts"), prohibits execution of State laws on Hawaiian home lands merely because the United States Congress has not expressed its consent to the exercise of such enforcement power. Absent a demonstrable intent to restrict the government's authority to enforce State and county (formerly territorial) criminal laws on Hawaiian home lands, we are unwilling to hold that HHCA § 206 [8] precludes the enforcement of such laws.

*Id.* at 171–72, 907 P.2d at 757–58 (ellipsis in original). Similarly, we conclude that the DLNR's statutory authority to manage and exercise control over ocean waters did not preclude the enforcement of ROH § 7–7.2 against Bereday in this case.

2.

■ Bereday argues, in the alternative, that even if the City had jurisdiction to enforce ROH § 7–7.2 against her, the prosecution against her was barred because the City failed to comply with HRS § 46–1.5(24)(A) (Supp.2008). That statute provides:

> *Each county may impose civil fines, in addition to criminal penalties, for any violation of county ordinances or rules after reasonable notice and requests to correct or cease the violation have been made upon the violator.* Any administratively imposed civil fine shall not be collected until after an opportunity for a hearing under chapter 91. Any appeal shall be filed within thirty days from the date of the final written decision. These proceed-

8. HHCA § 206, *as reprinted in* volume 1, HRS (1993 & Supp.2008), provides: "The powers and duties of the governor and the board of land and natural resources, in respect to lands of the State, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided in this title."

ings shall not be a prerequisite for any civil fine or injunctive relief ordered by the circuit court[.]

HRS § 46–1.5(24)(A) (emphasis added).

Bereday argues that under HRS § 46–1.5(24)(A), the City was required to provide her with reasonable notice and the opportunity to correct or cease the alleged violation before charging her with violating ROH § 7–7.2. Bereday's argument is without merit. The plain language of HRS § 46–1.5(24)(A) establishes that its notice requirements apply under circumstances in which a county seeks to impose civil fines. Here, Bereday was charged with criminal offenses and was sentenced to criminal penalties. Thus, HRS § 46–1.5(24)(A) does not apply to Bereday's case.

## II.

Bereday was convicted of two counts of violating ROH § 7–7.2(a) which provides in relevant part:

> A dog owner commits the offense of negligent failure to control a dangerous dog, if the owner negligently fails to take reasonable measures to prevent the dog from attacking, without provocation, a person ... and such attack results in: ... bodily injury to a person other than the owner.

Bereday argues that the prosecution failed to adduce sufficient evidence to support her convictions. She contends that there was insufficient evidence to show that: 1) her dog, Bobo, was the attack dog, 2) Bobo was dangerous, 3) Bobo was not provoked, and 4) Bereday was negligent. We disagree.

We apply the following standard of review in evaluating the sufficiency of the evidence:

> We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be

said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

> "Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion. And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.

*State v. Batson*, 73 Haw. 236, 248–49, 831 P.2d 924, 931 (1992) (citations omitted).

### A.

■ There was substantial evidence that Bereday's dog, Bobo, was the dog that committed the attacks on Keeton and Yuri. The evidence showed that Bereday was the owner of a black-colored Rottweiler named Bobo. The prosecution introduced documentary evidence that an animal registration license had been issued to Bereday as the owner of a "BLACK/BROWN" Rottweiler named "Bobo" for periods during 2002–2003 and 2005–2006, with a registration date of May 13, 2005, for the 2005–2006 license. A black Rottweiler that accompanied Bereday to the beach attacked Keeton and Yuri on different days in May 2005.

Keeton's mother testified that a black Rottweiler, with a name that started with a "B," chased and bit her two-year-old son, Keeton. Officer Eric Fontes, who went to Bereday's residence on that same day to investigate the incident, saw a Rottweiler, wet and covered in sand, at the residence. Yuri's father testified that he saw Bereday with a black Rottweiler with brown around its eyes at the beach. The father testified that after the Rottweiler bit his five-year-old daughter, Yuri, the father thought that Bereday used the name "Bobo" in calling the Rottweiler. Investigator Ryan Vaughn went to Bereday's residence on May 13, 2005, the day Yuri was bitten, and issued a renewed licence to Bereday for a Rottweiler. None of the other dogs at the residence appeared to be a Rottweiler.

In any event, ROH § 7-7.2 does not require the prosecution to identify the dog by name, but simply requires the prosecution to establish that it was a dog owned by the defendant that committed the attack. There was ample evidence that a dog owned by Bereday attacked Keeton and Yuri. There was also undisputed evidence that the attacks by Bereday's Rottweiler resulted in bodily injury to the children. Both children were bitten by the Rottweiler and suffered puncture wounds that required stitches to close.

### B.

There was sufficient evidence that Bobo was a dangerous dog and that it attacked Keeton and Yuri without provocation. ROH § 7-7.1 (1990 & Supp. No. 12, 2-08) defines the terms "dangerous dog," "attack," and "provocation" as follows:

> "Dangerous dog" means any dog which, without provocation, attacks a person or animal. A dog's breed shall not be considered in determining whether or not it is dangerous.
>
> . . . .
>
> "Attack" means aggressive physical contact with a person or animal initiated by the dog which may include, but is not limited to, the dog jumping on, leaping at or biting a person or animal.
>
> . . . .
>
> "Provocation" means the attack by a dog upon a person or animal was precipitated under the following circumstances:
>
> (1) The dog was protecting or defending its owner or a member of its owner's household from an attack or assault;
>
> (2) The person attacked was committing a crime or offense while on the property of the owner of the dog;
>
> (3) The person attacked was teasing, tormenting, abusing or assaulting the dog or at any time in the past had teased, tormented, abused or assaulted the dog;
>
> (4) The dog was attacked or menaced by the animal or the animal was on the property of the owner of the dog;
>
> (5) The dog was responding to pain or injury inflicted by the attacked person or animal;
>
> (6) The dog was protecting itself, its kennels or its offspring from the attacked person or animal;
>
> (7) The person or animal attacked was disturbing the dog's natural functions, such as sleeping or eating, while the dog was on its owner's property; or
>
> (8) The dog was responding to a command or encouragement to attack the person or animal.

(Sequence of the definitions in the statute changed.)

Bereday argues that the prosecution, as part of its case in chief, was required to prove that the dog attacked "without provocation" and therefore was required to refute all of the possible circumstances of provocation described in the ROH § 7-7.1 definition of provocation. The prosecution suggests that the absence of provocation is not a material element of the prosecution's case in chief, but that provocation is a defense for which the defendant must produce evidence before the prosecution's burden to disprove the defense arises. *See* HRS § 701-115 (1993).[9]

It seems odd to define a criminal offense in a way that would require the prosecution, as part of its case in chief, to prove the nonexistence of a laundry list of circumstances, many of which may have no relationship to the facts of the case.[10] The circumstances described in the ROH § 7-7.1 definition of provocation are analogous to the justification defenses of use of force in self-protection, use of force for the protection of other persons, and use of force for the protection of proper-

---

9. The prosecution cites the doctrine that makes an exceptive provision in a criminal statute a defense "when the facts hypothesized in the exceptive provision are peculiarly within the knowledge of the defendant, or the evidence concerning them is within the defendant's private control." *State v. Jenkins*, 93 Hawai'i 87, 107, 997 P.2d 13, 33 (2000) (citation, quotation marks, and brackets omitted).

10. The district court remarked that ROH § 7-7.2 was "not the most artfully written ordinance I've ever seen."

ty that apply to the use of force by a person. *See* HRS §§ 703–304, –305, and –306 (1993).

In this case, we need not decide whether the absence of provocation is a material element of the offense or whether the presence of provocation is a defense. Assuming arguendo that the prosecution was required to prove the non-existence of all the circumstances set forth in the ROH § 7–7.1 definition of provocation, we conclude that there was sufficient evidence to prove that the attacks by Bobo were without provocation.

■ The witnesses' testimony describing the nature of and setting for the attacks was clearly sufficient to prove that the attacks were not provoked within the meaning of paragraphs (1), (2), (4), (5), (6), (7), and (8) of the ROH § 7–7.1 definition of provocation. Indeed, the only circumstance of provocation specifically argued by Bereday on appeal concerns paragraph (3) which states: "The person attacked was teasing, tormenting, abusing or assaulting the dog or at any time in the past had teased, tormented, abused or assaulted the dog[.]"

■ Bereday argues that evidence 1) that Keeton had attempted to pet the Rottweiler and 2) that Yuri's father had attempted to shield Yuri from the Rottweiler as the dog swam toward Yuri established that the Rottweiler had been provoked. We disagree.

The evidence showed that Keeton attempted to pet Bobo but did not touch the dog because Bereday told Keeton to stop. Keeton's attempted petting took place earlier in the day, some time before the attack. Keeton did not say or do anything to Bobo immediately before being chased and bitten. Yuri's father attempted to position himself between Yuri and Bobo to protect Yuri only after he saw the Rottweiler heading toward Yuri. When viewed in the light most favorable to the prosecution, there was sufficient evidence to show that the persons attacked did not precipitate the attacks by "teasing, tormenting, abusing or assaulting" the Rottweiler on the day they were attacked.

■ The prosecution introduced evidence that neither Keeton's mother nor Yuri's father had ever met Bereday before their children were attacked and that Keeton was two

years old and Yuri was five years old at the time of the attacks. Based on this evidence, the district court could reasonably infer that Keeton and Yuri had not previously come into contact with the Rottweiler and had not teased, tormented, abused or assaulted the dog at any time in the past.

### C.

■ Finally, there was sufficient evidence that Bereday negligently failed to take reasonable measures to prevent Bobo from attacking Keeton and Yuri. The evidence showed that Bereday was aware of Bobo's violent tendencies but nevertheless allowed Bobo to roam on the beach without a leash. Long before the attack on Keeton, Bereday had brought Bobo and another dog to the beach and warned Teri Marcus that the dogs were not friendly. Bobo's refusal to budge from its position in front of Keeton and his family, despite Bereday's verbal commands and physical attempts to pull Bobo away, provided Bereday with ample warning of the substantial and unjustifiable risk that Bobo would attack. Moreover, even after Bobo had attacked Keeton, Bereday failed to take reasonable precautions and instead permitted Bobo to run free and attack Yuri on the beach five days later.

### III.

■ We reject Bereday's contention that ROH § 7–7.2, as applied to her, is unconstitutionally vague and ambiguous. Bereday has failed to supply any discernible argument in support of this contention, and we can reject it on this basis alone. *See State v. Bui*, 104 Hawai'i 462, 464 n. 2, 92 P.3d 471, 473 n. 2 (2004).

■ In any event, her claim is without merit.

A criminal statute is unconstitutionally vague if it fails to define the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 525, 114 S.Ct. 1747, 128

L.Ed.2d 539 (1994) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)); *see also State v. Richie*, 88 Hawai'i 19, 31, 960 P.2d 1227, 1239 (1998).

*State v. Pegouskie*, 107 Hawai'i 360, 368, 113 P.3d 811, 819 (App.2005). In addition,

> The Hawai'i Supreme Court has held that in order to challenge the constitutionality of a statute on vagueness grounds, a defendant must show that the statute as applied to him or her is invalid. *State v. Marley*, 54 Haw. 450, 457, 509 P.2d 1095, 1101 (1973). Constitutional rights may not be asserted vicariously. *Id.* A defendant has no standing to challenge the vagueness of a statute based on its hypothetical application in other situations. *Marley*, 54 Haw. at 457–58, 509 P.2d at 1101–02.

*State v. Kuhia*, 105 Hawai'i 261, 271, 96 P.3d 590, 600 (App.2004).

ROH § 7–7.2 is not unconstitutionally vague as applied to Bereday's conduct in negligently failing to prevent her dog Bobo from attacking Keeton and Yuri. The ordinance gave Bereday fair notice that her conduct was prohibited. *See Kuhia*, 105 Hawai'i at 272, 96 P.3d at 601.

### IV.

■ Bereday waived her claim that the district court erred in denying her pretrial motion for severance by not renewing the motion during trial. *State v. Balanza*, 93 Hawai'i 279, 288, 1 P.3d 281, 290 (2000). But even if not waived, the claim is without merit. The charges were properly joined pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 8(a)(1) because they involved offenses "of the same or similar character. . . ." The severance question was therefore controlled by HRPP Rule 14, which gives the trial court the discretion to sever charges "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses. . . ." In deciding whether severance is appropriate, the court must "weigh the possible prejudice to the defendant against the public interest in judicial economy." *Balanza*, 93 Hawai'i at 289, 1 P.3d at 291 (citation omitted).

■ Here, judicial economy supported the trial of both charges together, as the evidence regarding the May 8th charge was relevant and admissible to prove the May 13th charge. Evidence that Bereday's Rottweiler had attacked Keeton on May 8, 2005, was highly relevant to show that Bereday negligently failed to take reasonable measures to prevent the dog from attacking Yuri on May 13, 2005. In addition, the risk of any potential prejudice from the joint trial was significantly diminished because Bereday had a bench trial, and "[i]n a bench trial, we presume that the judge was not influenced by incompetent evidence." *State v. Lioen*, 106 Hawai'i 123, 133, 102 P.3d 367, 377 (App. 2004). We conclude that the district court did not abuse its discretion in denying Bereday's motion for severance.

### V.

■ The prosecution concedes that the district court erred in sentencing Bereday to six months of probation subject to the condition that she serve five days of imprisonment for the May 13th offense. We agree with this concession as it is supported by the record and well-founded in law. *See State v. Hoang*, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000).

There was no evidence that Bereday had been convicted of violating ROH § 7–7.2 prior to the offenses charged in this case. Thus, under ROH § 7–7.2(c)(2), Bereday was subject to "[a] period of imprisonment of up to 30 days, or in lieu of imprisonment, a period of probation of not more than six months in accordance with the procedures, terms and conditions provided in HRS Chapter 706, Part II[.]" *See supra* note 3. HRS Chapter 706, Part II is the portion of the Hawaii Penal Code that pertains to imposition of a sentence of probation. Bereday's violations of ROH § 7–7.2 were petty misdemeanors because each offense carried a maximum penalty of thirty days of imprisonment. HRS §§ 701–107(4) (Supp.2008) and 701–118(1) (1993).

In 2005, at the times relevant to Bereday's charged offenses, the Hawaii Penal Code authorized the sentencing court to impose for a petty misdemeanor either a term of probation of up to six months or a term of imprisonment of up to 30 days, but not a term of imprisonment as a condition of probation. HRS §§ 706–623(1)(d) (Supp.2005), 706–

624(2)(a) (1993), and 706–663 (1993). The version of HRS § 706–624(2)(a) applicable to Bereday's charged offenses only permitted a sentencing court to impose imprisonment as a condition of probation for felonies and misdemeanors, not for petty misdemeanors.[11]

Accordingly, for the May 13th offense, the district court erred in sentencing Bereday to a six-month term of probation that was subject to the condition that she serve five days of imprisonment. We therefore vacate that sentence and remand the case for resentencing on that offense.

## CONCLUSION

Based on the foregoing analysis, we: 1) affirm the December 18, 2006, Judgment filed by the district court in Case No. 1P105–07481, which pertains to Bereday's May 8, 2005, offense; 2) affirm Bereday's conviction for the May 13, 2005, offense, but vacate the portion of the December 18, 2006, Judgment filed by the district court in Case No. 1P105–07480 that reflects the sentence imposed for the May 13, 2005, offense; and 3) remand the case for resentencing on the May 13, 2005, offense and for further proceedings consistent with this opinion.

---

11. HRS § 706–624(2)(a) (1993) was amended in 2006 to permit the imposition of up to five days of imprisonment as a condition of probation for petty misdemeanors. 2006 Haw. Sess. Laws Act 230, § 20 at 1009. However, the amendment did not take effect until June 22, 2006, well after the two incidents charged in this case. *Id.* at § 54 at 1025.